The next case is Jamilia Jones v. Allstate, and Mr. Jent and Mr. Brahman are here, along with Mr. Powell. You may begin, Mr. Jent. May it please the Court. My name is Kevin Jent. I'm here on behalf of Jamilia Jones in a claim she's filed against Allstate. We have three separate issues here. Did the District Court err in dismissing Ms. Jones' sexual harassment claim? Did the District Court err in dismissing her FMLA claim by applying the but-for causation standard, which the DOL is here to argue on behalf of as amicus on that? And did the District Court err in holding that Ms. Jones cannot maintain an ADA and a Title VII retaliation claim in the same lawsuit because of the but-for causation standard, which prohibited that? I'm going to start with the sexual harassment claim because that's the claim where everything else flows from. Ms. Jones was employed at Allstate, and she was supervised by Mr. Johnson. Mr. Johnson was the only harasser she faced at Allstate. And Mr. Johnson, his harassment of her took many forms. It was comments. It was touching, texting. When did his harassment end? His harassment ended in April, May of – he was her supervisor. The comments, the texting, the touching ended in end of November, December. The staring and the – December 2011. The big one. Okay. Do we have a period of time problem? We have a – that's what the District Court ruled is that we could not continue when she came – Ms. Jones went out on FMLA leave in December, January time period, came back in March. Mr. Johnson continued to come around her, to come to her desk to actually look over her cubicle to just stare at her, to leer at her for minutes. She would have to get her then-supervisor to have him move. She told him she felt uncomfortable running into him. But does the fact that they – that Allstate transferred Johnson after what I'll call the first and sort of more gruesome set of circumstances, does the fact that they transferred him after that break the chain between that stuff and the staring? I don't think so because the staring, he would do that also. It was something he would do to her also during the first part. He was still a supervisor. The transferring did not stop anything. They did not caution him about his interactions with her. They did not do anything to prevent him – to make him leave her alone. He was still continuing, you know, here I am. I'm looking at you. You know, it's the same. And it's only staring, right? It's only staring at that point. Which case talks about sexual harassment about only staring after – because I'm worried about the December 2011. Which case? Like the district judge where they say staring is sufficient. You may be talking about the Mendoza case. That's the one I remember that talks about staring. It does not say staring is sufficient, but we have staring here along with everything else. I think you can't separate the two time periods. You've got to put the staring in conjunction with this is a person who was making these horrible comments, who was texting her things, who was touching her inappropriately whenever he would get her alone. It's the same environment. It's the same actions. You know, they may have taken a different form, but it is still the same sexual harassment. I'm a supervisor here. I've been here forever. He had even told her he had complaints of harassment against him before, but he was still there. And he said he was using it as a way to show her that you could overcome your circumstances or bad things happening to you there. But at the time they transferred him, she had not yet made a complaint of sexual harassment per se, right? She had made these sort of vague allegations about profanity and managerial style. So why wouldn't the transfer there be a reasonable response to what Allstate knew about that situation? Because it did not move him out of her area. He was still there. He was still there every day. She was reporting to the same area. He was supervising the same groups of people that she was. It was a rotating system of supervisors. I mean, I guess I sort of get it. If they knew everything that you and I know now, which is disturbing to say the least, if they knew everything that we know now, that would seem to be an insufficient response. But given what they knew, managerial style, profanity, why isn't kind of the transfer even not off the floor sufficient? Well, they knew more. There had been two previous complaints against Mr. Johnson of similar allegations that he was doing these things to women under his supervision that Mr. Prime, who was the manager, knew about. He had been involved in the investigation before. He knew there had been allegations. But they had found those not to be substantiated. Is that right? They had found them not credible. They had been substantiated. Curiously, they were not credible because two women told similar stories, and so they didn't believe them because their stories were too similar. And so they both had said that he had requested sex from them. And so when Ms. Jones goes in and she's talking to Ms. Dawkins, but then she's talking to Mr. Prime and she's telling him he's making unwanted remarks, you know, he's not professional with her, they don't go any further. They don't inquiry. They don't ask her any questions about what has happened here. Why is this like this? They don't do anything. They just say, well, we'll just put you on paper to another supervisor. You'll be in the same area. You'll be around him all the time. No physical moving of workstation at all? No physical. It was the same. It was a large room. She may have moved chairs, but it was still just one big, large room, a call center. And so that's why I say the claims, the environment period should have been counted as one for the entire period. And since it looks like you're going to be in charge of talking about the sexual harassment piece, can you address the Farragher defense as well? I think that the Farragher defense, she did go to the supervisor. She went to his supervisor. She went to that supervisor's supervisor and tried to complain about him as best she could. She broke down a couple of times with the female supervisor, telling her, you know, that he was making these remarks. He was cussing. He was using provanity. He was, you know, making her feel uncomfortable. They never went further into that. They never went any further. Then she went to Mr. Prine, who had knowledge of Mr. Johnson's previous actions. And so they never, nobody ever went further into that. She comes back. He's still doing it. She's complaining to Mr. Head, who was her supervisor then. She eventually sends an email out laying this out. He's still there doing the same stuff after she sends the email. You know, there's an investigation that goes on for a week or two, and she's still there running into him. He's still coming and staring at her. Nothing is done to stop this until eventually they see the text messages. And even after they see the text messages, they want to complete their investigation. He's still doing the staring. He's still coming at her and making her aware of his presence, aware of the harassment. But so you don't, I guess it sounds like you don't really quarrel with what I'll call prong one of Farragher, that they had this sexual harassment policy in place, distributed it. They had a policy and they had training. You know, it's a fairly large company at Allstate, and I'm not disputing that. So we're really sort of at prong two in whether she diligently pursued the remedies available to her. And, I mean, isn't it at least indicative of Allstate's response that they, when she finally made, like when she sort of really finally told what had been going on, it seems then like there was pretty swift action, right? Within 14 or 15 days he was gone. Within a couple of weeks he was gone, only because she had text messages. They're clear about that, that if she had not had text messages, just like the people before her, he would not have been gone. I had just a curiosity question. I'm not really sure it matters. But did I read correctly in the record that in the text exchanges they had his messages but not her responses or something? I believe that's what was. Do we know what happened there? I don't, Your Honor. Okay. I'm out of. Thank you, Mr. Jett. We'll hear from Mr. Grauman. Good morning, Your Honors. May it please the Court. My name is Jesse Grauman, representing the Secretary of Labor. We are participating as amicus exclusively on the question of whether the FMLA supports a mixed motive theory for claims of retaliation for exercising FMLA rights. Can I ask you a quick question before you get started? Because I know that's sort of the interesting question here, one of the interesting questions. And I think you're in a position to answer this. But don't all of these retaliation claims require an adverse employment action? And if there is no adverse employment action, then is all of this very interesting stuff about where the cause of action resides and whether mixed motive in a regulation is sufficient post-Nasser and Gross, does all that just sort of melt away? So I guess I'll restrict myself to the FMLA itself because it's not really in my lane to comment on the other statutes. I'm fairly certain that there is an adverse employment action, which my understanding is in this case the allegation is that it was a constructive discharge. Although I'll leave that to Mr. Gent, but that's my understanding. So there are two principal reasons why this Court should join the Second, Third, and Sixth Circuits and hold that Gross and Nasser do not control this case. The first being the text of the statute and the second being the application of Chevron deference. Regarding the text, we have a threshold question first of which provision are we talking about. There's no dispute that the FMLA does prohibit retaliation for exercising rights, but there is a question as to the source of that prohibition. And what we'd urge this Court to do is just reaffirm what it stated only two years ago in Certan and join the First, Second, and Third Circuits in conclusively holding that 2615A1 is the source of this prohibition. The reason A1 best encompasses this prohibition is that, first of all, that neither of the two explicit anti-retaliation provisions in A2 or B is on point. They address opposing unlawful practices and participating in proceedings and inquiries, neither of which is actually exercising the substantive rights under the FMLA. In contrast, on the other hand, we have the broad prohibition against interference with FMLA rights in A1, which can be understood to include a prohibition against retaliation. Indeed, the Second Circuit would recognize that such a prohibition fits comfortably into A1. And that's particularly the case under FMLA, given that part of the substantive right under the FMLA is the right to return to the same or a similar position. Certainly, you can't well be understood to have been able to exercise your rights if, as soon as you return to that position, you suffer an adverse employment action. So, indeed, failing to understand A1 as prohibiting this type of retaliation would significantly undermine an employee's right to leave and restoration to a similar position under the FMLA. So, assuming you're right about A1, talk to us about Nassar and Gross. Sure. So, there's, again, as I mentioned, two reasons why Nassar and Gross are distinguishable. The first is the language of the statute. Nassar and Gross, of course, both involve statutory causation schemes, using the words because of, which the Supreme Court understood to mean but for causation. But it's notable that I believe neither the defendant nor the district court cited any appellate cases, any court of appeals cases, holding that language similar to A1 requires but for causation in light of Nassar and Gross. Here, the language that we have in A1 is broad language. It's anti-interference language. That's a very different, broader language. It doesn't include any language of causation, certainly, let alone but for causation. And as the Second and Third Circuits, we believe, correctly held in Woods and Egan, that essentially created a gap and indicated that Congress delegated a gap-filling function to the Department of Labor under Chevron. So what's the best response to this, I guess, difficult piece of language in Nassar, I think, for you where they say but for as the background rule and absent an indication to the contrary in the statute itself, that rule governs? I think the way one can read Nassar and Gross is that, first of all, that's the case if you have a causation regime in the statute, if you have essentially a cause and effect in the statute. And by default, if you have essentially a cause and effect, Congress is assuming that what we're talking about is but for causation. Here in A1, we have this broad prohibition against interference. There is no causation language. And so that's something where the department understood and interpreted using a notice and comment regulation, that's a prohibit retaliation. And so as long as its interpretation is reasonable, the department was entitled to figure out what level of causation. The other response they would give to that is and this we feel is really a very critical distinction that in Gross itself, the Supreme Court distinguished the case of NLRB versus Transportation Management Corporation on the basis that that was a case involving Chevron deference. That was a case involving the NLRA, the National Labor Relations Act, which actually the provision there, it's an anti-interference provision that's very, very similar to the language of the FMLA. And the question was, well, why wasn't the result there essentially overruled in light of Gross and Nassar? And the Supreme Court said, no, that was a case where we weren't called upon to interpret the statute in the first instance. That was a case where we were simply called on to defer to the agency. The agency, in that case, the NLRB, understood the interference language in the NLRA to permit mixed motive burden shifting approach. And that, according to the court in Gross, was fine and it didn't disturb the holding in that case. And so we would submit that this case is really much more analogous to transportation management than it is to Nassar or Gross. And what about the fact that in Nassar, didn't the court also in Nassar reject, not under Chevron, but under Skidmore, the EEOC's, I don't know, was it guidelines or manual or some such? Yeah, and I think there, you know, our primary response would be it's very, Skidmore and Chevron are certainly very different levels of deference. Chevron deference is controlling as long as the agency's interpretation is reasonable. And again, I think another distinction we would make between the facts of Nassar and Gross in this case are that the statute in Nassar and Gross, the statutes at issue in Nassar and Gross were both enacted as part of those, or both at least amended as part of those 1991 Civil Rights Act amendments. And so it was certainly understandable that the court said if Congress was going to create a mixed, explicitly create a mixed motive causation here in one provision, Title VII anti-discrimination, but not in these other two, Title VII anti-retaliation and the ADEA, then it's reasonable to assume that it didn't want to apply mixed motive to those other two. On the other hand, this is a completely different statute. It was enacted two years later, and I think, you know, Congress shouldn't be expected to specify mixed motive in the FMLA, or it would not be reasonable to simply say, well, because they included mixed motive in a completely different statute past two years prior, they needed to include it here as well. We have your argument, Mr. Brauman. Thank you. We have Mr. Powell. May it please the Court, Your Honors. Charles Powell for Allstate. Judge Newsom, I believe you're absolutely correct. The FMLA argument as to textual structure and burden of proof, I think, is a great law school question. It's a great intellectual question. I personally believe the Department of Labor is wrong, but I don't think it matters in this case. The only adverse action for purposes of the FMLA or the ADA and Title VII retaliation claims is an alleged constructive discharge. This circuit has a long history of the level of severity of conduct that is necessary to establish a constructive discharge. Factually, in this case, Ms. Jones cannot meet that standard under any test. The timing of issues here is, as the questions to Mr. Jen earlier indicated, the egregious conduct that is alleged to have been perpetrated by Mr. Johnson ceased in 2011. Factually, although Ms. Jones likes to gloss over this in her brief, she worked for two days in 2012 before Mr. Johnson was terminated. She wrote a letter finally in April during which she disclosed information. She worked two days and in her deposition testimony in the record indicated that the harassment by Mr. Johnson ceased when he ceased being her supervisor. Beyond that, she took off most of May, all of June on short-term disability leave, and the majority of the month of July. She did not resign until September of 2012. So the bad conduct to the extent it occurred ceased almost nine months before she tendered a two-week resignation. Under Bork from the predecessor Fifth Circuit in 1980, a two-week notice cuts off a constructive discharge claim. So in the absence of her ability to prove a constructive discharge, which the district court found at summary judgment, this issue with the FMLA makes no difference in the outcome of the case, whether it's a motivating factor or a but-for standard does not matter. The ADA and Title VII retaliation claims, which clearly have but-for standards now in light of Supreme Court precedent, also don't matter because she cannot prove a constructive discharge. So as the only adverse action for her FMLA claim, her ADA claim, and her Title VII retaliation claim, all of those claims were properly dismissed because the evidence does not support an adverse action. On the sexual harassment claim, the sequence of events is clear. All of the allegedly bad acts and the allegations are atrocious occurred in 2011. It is undisputed that Allstate had a policy that said either complain to your supervisor, and if that is not possible, go to Human Resources. Ms. Jones admitted in her testimony she knew Allstate had a Human Resources Department, and there was a local Human Resources person who was available to her. In December of 2011, she admits she did not disclose details of Mr. Johnson's conduct while he was her supervisor. She gave a very vague description. On the basis of that description, the company transferred her to a different supervisor. And then we have a four-month gap, part of which she's on FMLA leave, which is why there's no underlying interference claim because she got more than 12 weeks of leave. And then maybe she works two days, during which the company is finally investigating a proper report of sexual harassment. And at the conclusion of which, the company did what they had told Mr. Johnson they would do to him following a complaint in 2009, and that is, it's undisputed in the record, Mr. Prine testified that what Mr. Johnson was told after the second unsubstantiated allegation is if there's ever another complaining issue, you will be discharged, which is exactly what occurred when Ms. Jones, in fact, utilized the correct procedure. And under MADRE and other cases from the 11th Circuit, if there's a specified procedure, the employee must follow it. Otherwise, there's no basis for notice to the company. So, to address the Farragher question that was posed earlier, the company has a policy. The policy includes a very specific mechanism for how she was to complain. She admittedly did not invoke that procedure at any point while Mr. Johnson was her supervisor. She was then transferred, which we believe the District Court correctly found under Morgan, constituted an intervening act that severs the supervisory harassment period in 2011 from these alleged instances of staring as a co-worker in 2012. Now, it is clear that co-worker harassment and supervisory harassment are subject to two different standards of proof. If it were a supervisory case, there would be an affirmative defense on all state. We believe we have met that because Ms. Jones admittedly, while Mr. Johnson was her supervisor, did not follow the policy and did not disclose the nature of his complaint. She did not avail herself of the policy. And we believe all of those actions are time-barred. The supervisor or the co-worker harassment in 2012 is completely insufficient to establish a claim. And even if you lump it in together and treat all of it as co-worker harassment, including the untimely events in 2011, there was no actual knowledge to the company. And there was no reason the company should know specifically what she claims Mr. Johnson was doing because the record evidence from her deposition is she does not recall whether she was specifically asked to disclose the details. And Mr. Prine testified unequivocally in his deposition that he asked her for details and she refused. It is absolutely clear by Ms. Jones' own admission, though, Your Honors, that she did not provide details of Mr. Johnson's 2011 conduct. So she didn't put all state on notice until she wrote a note in late April of 2012, which resulted in the investigation and Mr. Johnson's discharge. So on that basis, we believe the district court correctly found not only that all of the 2011 conduct was untimely and the intervening act of the transfer severed that link, but the judge went on to analyze it under both a Farragher-Ellerth and a newer should-have-known co-worker standard and found she couldn't meet either of those. And we believe that decision was correct. I'm happy to address the... Well, yeah, so on the assumption or the risk from your perspective that you might be wrong about adverse employment action, let's talk about the law school question, I guess. Let's talk about, I mean... I'm happy to. Yeah, do you, you don't deny, I assume, that somewhere in the FMLA or its implementing regulations there is a cause of action for retaliation? No, Your Honor, I do not dispute that. And so it just seems to me, I think, at least I think I think, is that the clearer statutory home for it is A-1. Because A-2, I take the Department's point that A-2 and B-1, I think it is, A-2 and B, they both seem to be addressing, one of them seems to be addressing litigation or advocacy and one of them seems to be addressing participation in a complaint procedure. And so it seems like if retaliation is going to land anywhere, it's got to land in the interference prong. And isn't that what we said in Sertain? Well, I believe that was dicta in Sertain. And this specific issue, I don't believe, has been brought to the court. And I know there are recent cases that have accepted the Department of Labor's position, but I submit that I believe those cases are incorrectly decided and I do not believe the statute in fact has the gap that the Department of Labor says supports its authority to develop a regulation and I will tell you why. Judge Acker cited in the summary judgment opinion the congressional record when the Family Medical Leave Act was adopted in 1993. And he quotes in the summary judgment opinion, I think it's from a Senate report, but it could be the House report, an indication that Congress at the time it was adopting the FMLA believed that the retaliation provision in the FMLA not only was A-2, but that it was to be interpreted like Title VII. So let's look at Title VII. Well, I'm more interested really in the text of the statute than I am what the Senate report says. I mean the text of the statute, A-2 seems pretty tough. Opposing unlawful practices, that wasn't what she was doing when she was taking leave. B-1, filing a charge, instituting a proceeding, giving information, that's not what she was doing when she was taking leave. So you're left with interference, which is a broad term, but, you know, means impede, frustrate, meddle, whatever. And it seems capacious enough to include this. I suppose one can, in my view, twist the statute to get there. Here's the Title VII analogy that I believe supports an interpretation that retaliation lies in A-2 and B. Title VII has both an opposition clause and a participation clause. It has two types of retaliation, all right? It also has an underlying provision that says you cannot discriminate on the basis of, and then it lists particular characteristics, race being one of them, gender being another. The interference prong says if you, requires, if you are a qualified individual under the statute, you are an eligible employee, you are entitled to certain specific rights, you are entitled to leave. In this case, there is no dispute that Ms. Jones was given more than the 12 weeks of leave she was entitled to under the statute. And she was returned to work and then chose on her own not to work for roughly an additional three months. Part of that was short-term disability leave, part of that was just time away from work. So she was given the full measure of leave that she's entitled to under the statute. But like Title VII, the retaliation provision, you either complain about your rights being violated. So you tell your employer, I'm entitled to this and you're not giving it to me. That is opposition protected conduct that gets you an A-2 retaliation claim. Or you sue somebody for interfering with your rights. I'm an eligible employee, I have submitted my medical documentation, and you deny me leave to which I am entitled. You have now interfered with my rights. That's one cause of action. And my separate cause of action is I'm going to tell you that you're wrong and I'm going to take some action, and then it's either A-2 or B, depending on whether you fire me or demote me or take some other tangible adverse employment action after the protected conduct occurs. But how does either the opposition clause or the participation clause cover simply taking the leave and then being punished for taking the leave? Not squawking about it necessarily or doing anything formally about it, but just taking the leave and now being punished for taking the leave. And I get it that you say that's a meritless claim here, but I'm just interested in where the claim exists. Well, there is a difference, I believe, in a straight interference claim. You have denied me a right I'm entitled to under the statute, and you are intentionally retaliating against me with an adverse motive. I believe Congress intended that claim, the adverse motive claim, to lie in A-2 or B. And I get, as Mr. Grauman put it, A-1 can be understood, meaning you can read it one way. You can read it one way. You can read it a different way. Nasser and Gross can be understood. What I believe is clear from the Supreme Court's recent but-for cases is that the court looks to the exact language in the statute, and the court doesn't say that Congress has to specify exactly what is occurring. But if Congress did not say, especially two years after it amended Title VII and the ADA in the 1991 Civil Rights Act, if Congress didn't say this is specifically what we intend, then the closest evidence we have is the congressional record at the time they adopted the statute. What does her complaint say? She files under A-1. Her complaint does not specify which portion of the statute. It just says FMLA. And it indicates that she believes that she was constructively discharged following the taking of FMLA leave. That's the gist of it. There's no, she doesn't cite a particular provision of the statute. But she includes that language that we see in A-1 that the Allstate interfered with her FMLA leave, right? Yes, Your Honor. I believe she does use the word interfere. So is it your position that Nassar and Gross effectively prevent an agency ever from promulgating a regulation specifying a mixed motive causation standard? Because either, I think under your rule, either Congress will have specifically spoken to it, in which case the agency has no room to operate, and I mean like affirmatively specifically spoken to it, or Congress will have said nothing. And I think on your view that nothingness sort of creates a vacuum in which the agency likewise is precluded from operating as a result of this default rule. Well, I don't know that I would go so far as to say never, Your Honor. I mean, I realize bright line rules are easier to enforce and they are easier to provide guidance to lower courts. I think in this instance, Congress included specific provisions to address opposition and participation retaliation just like exists in Title VII. And so with that backdrop, especially given amendments to Title VII two years prior to the enactment of the FMLA, what I don't believe exists in the FMLA, which is the only basis for the Department of Labor to act and under which Chevron deference would allow them to write the regulation that really appears to muddle A1 and A2 together, is that there would have to be a gap in the statute. And I believe based on Gross and Nassar saying you have to carefully read the statute and then read it in context of, you know, in reading this statute in the context of when it was adopted and in light of the opposition and participation clauses that exist in Title VII that mirror very closely the opposition and participation language in the Family and Medical Leave Act, I don't believe the gap exists here that permitted the regulation on which the but-for argument is made. In the end, because there's no, Ms. Jones does not meet the very high level for a constructive discharge claim. I think it's an academic argument in this case. Fascinating though it may be, I think it's academic in this case given the time period, you know, the long gap, the four months after Mr. Johnson had been discharged and really the lack of time that Ms. Jones was at work during 2012, I don't believe that under any of the statutes she can establish a constructive discharge under Eleventh Circuit precedent. There are no further questions, then I'm done. Thank you. Thank you, Mr. Powell. Mr. Jett, you've reserved some time. Yes, Your Honor. I believe there was an adverse action. I believe the constructive discharge. What we're leaving out here is what happened to Ms. Jones even after he was gone. She was confronted by several co-workers about the complaint she had made. She was told that no one wanted to talk to her unless they had somebody in the room with her. She was told, you know, the people were avoiding her. They knew she had made the complaint. It was just piling on to what had happened before. And she did request an accommodation. She had the PTSD and depression. She let them know that. And that's what she was out on FMLA for. And she requested accommodation to at least get five to ten minutes when she needed to compose herself. She would break down crying. She would become very emotional at work. And she asked for the accommodation to do that. And doesn't the summary judgment record reflect that she couldn't recall a specific instance in which she was denied that accommodation? They officially denied it. I mean, she may have been informally given or taken those events. But I don't think they allowed her to have it. And we're starting to charge her attendance points for the time she was missing. But you don't deny, I guess, your opponent's contention that a constructive discharge, the threshold is very high. The threshold is very high. And I think we have, you know, different components for each statute. The Title VII, you know, obviously we add in the complaints, the retaliation from making the complaint, the co-workers' comments to her, the being put on notice that everybody knew this had happened to her. That all plays in. And that's different than what would play into the ADA and FMLA retaliation. But I think there is enough here under each to provide a constructive discharge. The fact that she worked so little time is just indicative of how bad it was when she did come back. I mean, he was still there. He was still staring at her. She could not get away from him. Even moving him out from under him in the organizational structure did not stop his harassment and intimidation of her. And that is, you know, with her medical condition, that is why she took off. And it just shows that the harassment was ongoing. It was severe. It was pervasive. It was the same as it was before. The two-week notice aspect, she testified that she never intended to take. She submitted the notice but never intended to work it out. That she had just submitted it but was really intent on leaving immediately. And that is, you know, in the record. And as far as her testimony about the sexual harassment stopping when she was transferred out from under him, she testifies in her deposition, pages 52 to 54, 59 and 91, which is document 33, exhibit 1, that the staring, all this continued after she was moved, after she came back. So there is evidence in the record that this did continue after she came back. So we do have that. The other issue raised briefly is the ADA and Title VII retaliation. The issue of can you maintain multiple but four theories at the summary judgment stage. I think the Savage v. Secure First case settled that issue with the district court before. But I believe that the law is clear. You can still maintain the multiple but four causes in one case. All right. I think we have your argument. Thank you. Court is in recess until 9 o'clock tomorrow morning. All right.